**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-22782-Civ-COOKE/TURNOFF**

VITREO RETINAL CONSULTANTS OF
THE PALM BEACHES, P.A.,

      Plaintiff,

vs.

KATHLEEN SEBELIUS, in her official
capacity as Secretary of Health and Human
Services,

      Defendant.

_____/

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

For the reasons set forth in the accompanying memorandum of law, Defendant Kathleen

Sebelius, in her official capacity as Secretary of Health and Human Services, hereby moves for

summary judgment on all claims raised in Plaintiff's complaint.  <u>See</u> Fed. R. Civ. P. 56.

Dated:  February 13, 2014                   Respectfully submitted,

                                    STUART F. DELERY
                                    Assistant Attorney General

                                    SHEILA M. LIEBER
                                    Deputy Branch Director

                                 _/s/ Eric Beckenhauer_
                                    ERIC B. BECKENHAUER
                                    TAMRA T. MOORE
                                    Trial Attorneys
                                    U.S. Department of Justice
                                    Civil Division, Federal Programs Branch
                                    20 Massachusetts Ave. NW
                                    Washington, DC 20530
                                    Tel: (202) 514-3338
                                    Fax: (202) 616-8470

E-mail: eric.beckenhauer@usdoj.gov

*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-22782-Civ-COOKE/TURNOFF**

VITREO RETINAL CONSULTANTS OF
THE PALM BEACHES, P.A.,

      Plaintiff,

vs.

KATHLEEN SEBELIUS, in her official
capacity as Secretary of Health and Human
Services,

      Defendant.

_____/

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 4

A.    Statutory and Regulatory Background ................................................................. 4

    1.    Medicare Part B ...................................................................................... 4

    2.    Local Coverage Determinations ............................................................. 6

    3.    Medicare Claims Processing .................................................................. 7

B.    Factual and Procedural Background ..................................................................... 9

    1.    Lucentis ................................................................................................... 9

    2.    Lucentis LCDs ...................................................................................... 11

    3.    Investigation of Plaintiff ....................................................................... 13

    4.    Administrative Proceedings .................................................................. 14

LEGAL STANDARDS .................................................................................................. 14

ARGUMENT ................................................................................................................ 16

I.    THE COUNCIL'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE ............................. 16

    A.    Plaintiff Failed to Meet its Burden to Establish that its Administration of
        Lucentis Was Consistent with Accepted Standards of Medical Practice ............. 16

    B.    Plaintiff Fails to Demonstrate that the Council's Decision Rested on
        Irrelevant or Improper Evidence .......................................................................... 18

        1.    The FDA-approved package insert is an authoritative document
            that, at a minimum, contains relevant and useful information
            bearing on the standard of care ............................................................ 19

        2.    The Lucentis LCD unambiguously limited coverage of a single
            vial to use on a single eye, on a single patient ..................................... 20

3.    A drug manufacturer is presumed to be an expert in its own products, and its views on the standard of care for Lucentis are plainly relevant......................................................................21

4.    The CDC injection safety guidelines were part of the record, and have warned against the use of single-dose vials on multiple patients since 2007 ....................................................................22

5.    Plaintiff fails to demonstrate that the Council improperly relied on so-called "hearsay" ...........................................................24

C.    Plaintiff Fails to Demonstrate that the Council Departed from Agency Policy or Precedent Without Adequate Explanation ...............................................28

1.    The Council's decision is consistent with Medicare guidance on reimbursement for discarded drugs and biologicals ..................................28

2.    The Council's decision did not depart from the Medicare contractor's local coverage article for Lucentis........................................30

3.    The Council's decision is consistent with Medicare guidance on reimbursement for off-label uses .........................................................31

II.    THE COUNCIL'S DECISION DOES NOT RETROACTIVELY IMPOSE A NEW MEDICARE REIMBURSEMENT POLICY IN VIOLATION OF DUE PROCESS OR THE APA............................31

III.    THE COUNCIL'S DECISION DOES CHANGE THE PAYMENT RATE FOR LUCENTIS IN VIOLATION OF THE MEDICARE ACT ........................................................37

IV.    THE COUNCIL'S DETERMINATION THAT PLAINTIFF WAS NOT ENTITLED TO A WAIVER OF LIABILITY IS SUPPORTED BY SUBSTANTIAL EVIDENCE....................................38

CONCLUSION.......................................................................................................................41

## TABLE OF AUTHORITIES

**Federal Cases**

Almy v. Sebelius,
  679 F.3d 297 (4th Cir. 2012) ............................................................................ passim

Andrews v. Shalala,
  53 F.3d 1035 (9th Cir. 1995) ...................................................................................... 25

Arruejo v. Thompson,
  No. 00-2402, 2001 WL 1563699 (E.D.N.Y. July 3, 2001)........................................ 6, 7, 17, 18

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,
  462 U.S. 87 (1983).................................................................................................... 16

Barnes v. Sullivan,
  932 F.2d 1356 (11th Cir. 1991) .................................................................................. 15

Basco v. Machin,
  14 F.3d 1177 (11th Cir. 2008) .................................................................................... 25

Bloodsworth v. Heckler,
  703 F.2d 1233 (11th Cir. 1983) .................................................................................. 15

Bonner v. City of Prichard,
  661 F.2d 1206 (11th Cir. 1981) (en banc) ................................................................. 21

Bowen v. Georgetown Univ. Hosp.,
  488 U.S. 204 (1988)................................................................................................... 34

Catholic Health Initiatives Iowa Corp. v. Sebelius,
  718 F.3d 914 (D.C. Cir. 2013) ................................................................................... 34

Christopher v. SmithKline Beecham Corp.,
  132 S. Ct. 2156 (2012)............................................................................................... 34

Citizens to Preserve Overton Park v. Volpe,
  401 U.S. 402 (1971)................................................................................................... 15

Dial v. Healthspring of Ala., Inc.,
  541 F.3d 1044 (11th Cir. 2008) ................................................................................... 4

Diorio v. Heckler,
  721 F.2d 726 (11th Cir. 1983) .................................................................................... 26

iv

FCC v. Fox TV Stations Inc.,
    132 S. Ct. 2307 (2012) ............................................................................................ 34

First Am. Discount Corp. v. CFTC,
    222 F.3d 1008 (D.C. Cir. 2000) ............................................................................. 26

Friedman v. Sec'y of Dep't of Health & Human Servs.,
    819 F.2d 42 (2d Cir. 1987) ....................................................................................... 7

Fund for Animals v. Rice,
    85 F.3d 535 (11th Cir. 1996) ................................................................................. 15

Garcia v. Sebelius,
    No. 10-8820, 2011 WL 5434426 (C.D. Cal. Nov. 8, 2011) ...................................... 7

Gulfcoast Med. Supply v. Sec'y, Dep't of Health & Human Servs.,
    468 F.3d 1347 (11th Cir. 2006) (per curiam) .......................................... 8, 14, 15, 36

Haught v. Maceluch,
    681 F.2d 291 (5th Cir. 1982) ................................................................................. 19

Hays v. Sebelius,
    589 F.3d 1279 (D.C. Cir. 2009) ........................................................................ 36, 37

Heckler v. Ringer,
    466 U.S. 602 (1984) ................................................................................................ 6

Int'l Rehabilitative Sciences Inc. v. Sebelius,
    688 F.3d 994 (9th Cir. 2012) ................................................................... 6, 7, 21, 35

Jordan Hosp. Inc. v. Shalala,
    276 F.3d 72 (1st Cir. 2002) ................................................................................... 35

Mahon v. USDA,
    485 F.3d 1247 (11th Cir. 2007) ............................................................................. 25

Miami-Dade County v. EPA,
    529 F.3d 1049 (11th Cir. 2008) ............................................................................. 27

Nat'l Ass'n of Home Builders v. Defenders of Wildlife,
    551 U.S. 644 (U.S. 2007) ...................................................................................... 26

Newmann v. United States,
    938 F.2d 1258 (11th Cir. 1991) ............................................................................. 19

Owens v. Heckler,
    748 F.2d 1511 (11th Cir. 1984) ............................................................ 38

Painter v. Shalala,
    97 F.3d 1351 (10th Cir. 1996) ............................................................. 35

Palomar Med. Ctr. v. Sebelius,
    693 F.3d 1151 (9th Cir. 2012) ............................................................... 8

PDK Labs. Inc. v. DEA,
    362 F.3d 786 (D.C. Cir. 2004) ............................................................. 26

Qwest Servs. Corp. v. FCC,
    509 F.3d 531 (D.C. Cir. 2007) ............................................................. 34

Reyes v. Wyeth Labs.,
    498 F.2d 1264 (5th Cir. 1974) ............................................................. 21

Shalala v. Guernsey Mem'l Hosp.,
    514 U.S. 87 (1995) ................................................................................ 36

Thom v. Bristol-Myers Squibb Co.,
    353 F.3d 848 (10th Cir. 2003) ............................................................. 21

Thomas Jefferson Univ. v. Shalala,
    512 U.S. 504 (1994) .............................................................................. 15

Trustees of Mease Hosp., Inc. v. Sebelius,
    No. 09-1795, 2010 WL 3222097 (M.D. Fla. July 26, 2012) ................... 35

United States v. De Los Rios,
    No. 10-20527, 2011 WL 346087 (S.D. Fla. Feb. 1, 2011) ............... 5, 7, 17

Wyeth v. Levine,
    555 U.S. 555 (2009) .............................................................................. 22

**State Cases**

Hyman & Armstrong P.S.C. v. Gunderson,
    279 S.W.3d 93, 114 (Ky. 2008) ........................................................... 19

Morlino v. Med. Ctr. of Ocean County,
    684 A.2d 944 (N.J. App. Div. 1996) ................................................. 19, 22

Richardson v. Miller,
    44 S.W.3d 1 (Tenn. Ct. App. 2000) ............................................................... 19, 21


**Federal Statutes**

5 U.S.C. § 706 ...................................................................................................... 26
42 U.S.C. § 405 .................................................................................................... 14
42 U.S.C. § 1395h ................................................................................................. 8
42 U.S.C. § 1395k ................................................................................................. 4
42 U.S.C. § 1395*l* ................................................................................................. 7
42 U.S.C. § 1395u .............................................................................................. 5, 8
42 U.S.C. § 1395x ................................................................................................. 4
42 U.S.C. § 1395y ............................................................................................. 5, 31
42 U.S.C. § 1395ff ................................................................................... 13, 14, 30, 33
42 U.S.C. § 1395kk ............................................................................................... 8
42 U.S.C. § 1395ddd ............................................................................................ 8


**Federal Regulations and Rules**

42 C.F.R. § 405.904 .............................................................................................. 8
42 C.F.R. § 405.1060 ............................................................................................ 5
42 C.F.R. § 405.1062 .............................................................................. 5, 30, 32, 34
42 C.F.R. § 405.1063 ............................................................................................ 5
42 C.F.R. § 405.1100 ....................................................................................... 14, 30
42 C.F.R. § 405.1102 ........................................................................................... 33
42 C.F.R. § 405.1130 ....................................................................................... 14, 30
42 C.F.R. § 411.406 ........................................................................................ 39, 40
42 C.F.R. § 421.200 .............................................................................................. 8
42 C.F.R. § 421.304 .............................................................................................. 8
42 C.F.R. § 424.5 ................................................................................................. 7
42 C.F.R. § 424.30–424.44 .................................................................................... 7
Fed. R. Civ. P. 61 ............................................................................................... 26


**Agency Guidance**

Medicare Benefit Policy Manual
    Ch. 15, § 50.3 .................................................................................................. 5
    Ch. 15, § 50.4.2 .............................................................................................. 32

Medicare Claims Processing Manual
    Ch. 17, § 40 .................................................................................................. 28

Medicare Program Integrity Manual
    Ch. 13, § 13.1.3, 13.5 ................................................................ 20
    Ch. 13, § 13.5 .......................................................................... 20
    Ch. 13, § 13.5.1 ......................................................................... 6
    Ch. 13, § 13.7.11 .................................................................... 6, 18

Medicare Financial Management Manual
    Ch. 3, § 90 ............................................................................... 39
    Ch. 3, § 90.1(H) .................................................................... 39, 40

**Other Authorities**

Centers for Disease Control and Prevention, 2007 Guideline for Isolation Precautions:
    Preventing Transmission of Infectious Agents in Healthcare Settings .............................. 10, 23

Centers for Disease Control and Prevention, Single-dose/Single-use Vial Position and
    Messages (May 2, 2012) ................................................................................... 11, 23

Preventing and Recovering Medicare Payment Errors: Hearing Before the Subcommittee
    on Federal Financial Management, Government Information, Federal Services, and Internet
    of the Senate Committee on Homeland Security and Government Affairs, 111th Cong.
    (July 15, 2010) (statement of Deborah Taylor, Chief Financial Officer and Director, CMS
    Office of Financial Management) ............................................................................... 8

## INTRODUCTION

This case concerns the Medicare billing practices of Plaintiff, Vitreo Retinal Consultants of the Palm Beaches, P.A., for the drug Lucentis, which is injected into the eye to treat a form of macular degeneration.  Lucentis is packaged in single-use vials containing 2.0 mg (0.2 mL) of drug product.  The package insert — which contains the prescribing information recommended by the manufacturer and approved by the Food and Drug Administration ("FDA") — states that, when administered, the entire contents of the vial should be drawn into the syringe, and then the excess drug product should be "expelled" until the recommended dose of 0.5 mg (0.05 mL) is obtained.  Thus, when used as directed, each vial contains a single dose.  The package insert also states that "[e]ach vial should only be used for treatment of a single eye."  Thus, when used as directed, each vial treats a single patient.

Plaintiff, however, concededly extracted multiple doses from each vial of Lucentis and administered them to multiple patients, contrary to the manufacturer's recommendations and the FDA-approved labeling.  Plaintiff then billed Medicare multiple times for each vial, thus seeking "reimbursement" for several times its actual cost for the drug.  After an analysis of billing data revealed that Plaintiff's sole physician, Dr. Salomon Melgen, was billing for Lucentis at a significantly higher rate than his peers, a Medicare contractor conducted an investigation.  It concluded that, in 2007 and 2008 alone, Plaintiff overbilled Medicare for Lucentis by nearly $9 million.  After that determination was affirmed at each of four levels of administrative review, Plaintiff appealed to this Court.

In the decision on review here, the Medicare Appeals Council, acting on behalf of the Secretary of Health and Human Services, concluded that Plaintiff's practice of obtaining additional doses of Lucentis from a single vial is not "reasonable and necessary" — and thus not

eligible for payment under the Medicare statute — because it departs from "accepted standards of medical practice." That conclusion is supported by substantial evidence and merits deference from this Court. The Council identified four principal pieces of evidence that reflect the standard of care for Lucentis: (1) the prescribing information in the FDA-approved package insert noted above; (2) a local coverage determination issued by a Medicare contractor, which reflects the majority view of local health care providers that each vial should be used to treat only a single eye; (3) the drug manufacturer's own view, set forth in a letter to the Medicare contractor, that each vial should be used to treat only a single eye; and (4) the injection safety guidelines published by the Centers for Disease Control and Prevention, which since 2007 have cautioned against administering medications from single-dose vials to multiple patients. The Council expressly noted that, on the other hand, Plaintiff "provided no direct evidence of its own concerning the standard of care" for the administration of Lucentis. Indeed, even now, Plaintiff points to <u>no evidence</u> that <u>any physician</u>, other than Dr. Melgen himself, administers Lucentis by extracting multiple doses from a single vial. Thus, the Council properly concluded that Plaintiff failed to meet its burden to establish that its practice is consistent with the standard of care for Lucentis.

Plaintiff's efforts to show that the Council's decision rested on irrelevant or improper evidence fail at each turn. In particular, it is well established that a drug manufacturer's recommendations, as reflected in the FDA-approved labeling, are relevant to the standard of care. The Medicare contractor's local coverage determination — which repeated the package insert's explicit statement that "[e]ach vial should only be used for treatment of a single eye" — could not have been clearer. And Plaintiff fails to establish that the Council committed any procedural error, least of all one that affected the outcome of the proceedings.

Plaintiff's attempts to show that the Council departed from agency policy or precedent without adequate explanation fare no better.  The Council's decision was entirely consistent with Medicare guidance that permits reimbursement for discarded drugs and for off-label uses under certain circumstances, depending on whether the use is "clinically appropriate" for the drug in question — the same inquiry the Council undertook for Lucentis.  Thus, Plaintiff's comparisons to other drug products, such as Botox, Avastin, and Kenalog (or Triesence) are unavailing.  What is "clinically appropriate" for one drug may not be for another, and the standards of care for these drugs, reflected in part by their FDA-approved package inserts, vary in significant ways from that for Lucentis.  As just one example, unlike Lucentis, none of these drugs comes with an explicit "expel" instruction.

Plaintiff's fallback arguments also fail.  First, the Council did not violate due process by announcing a new policy, then applying it retroactively without fair notice.  The Council's decision was plainly an adjudication, not a rulemaking, and it is black-letter law that adjudications are by their nature retroactive, for they determine what the law <u>was</u>, not what it <u>will be</u>.  Moreover, the Council did not articulate a new policy, but applied an existing one, as is well within its statutory and regulatory authority.  Second, the Council did nothing to alter the statutory reimbursement formula for Lucentis.  Rather, it determined that Lucentis was reasonable and necessary, and thus would be reimbursed at the statutory rate, only where each vial was used to treat a single eye, on a single patient, consistent with the standard of care.  And make no mistake:  Under the Council's decision, Plaintiff was fully reimbursed, for every vial of Lucentis it purchased and administered, at the statutory rate of 106 percent of the national average sales price.  Here, it seeks to game the system by seeking reimbursement of 3 to 4 times its actual costs.

Finally, the Council properly determined that Plaintiff was not entitled to a waiver of liability because it knew or should have known that its administration of Lucentis was not consistent with accepted standards of practice.  The FDA-approved package insert has been clear since 2006; the CDC guidelines have been clear since at least 2007; and the Lucentis local coverage determination has been clear since January 2008.  And although Plaintiff claims to have always been "transparent" about its Lucentis practices, in fact it did not disclose those practices until July 2008 — <u>after</u> it was under investigation.

For these reasons, explained further below, the Court should grant summary judgment to Defendant and deny it to Plaintiff.

## BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    Medicare Part B

The Medicare program, established by Title XVIII of the Social Security Act, is a federally subsidized system of health insurance for the aged and disabled.  <u>Dial v. Healthspring of Ala., Inc.</u>, 541 F.3d 1044, 1046 (11th Cir. 2008).  The program is divided into four parts.  <u>Id.</u> Medicare Part B, at issue here, covers physician services, including drugs that are usually administered by a physician (like many injections) rather than self-administered (like most pills). 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(2)(A).

Not all such drugs, however, are covered under Medicare Part B, and some are covered only under certain circumstances.  Among other limitations, the Medicare statute explicitly provides that "no payment may be made under . . . part B . . . for any expenses incurred for items or services," including drugs, "which . . . are not <u>reasonable and necessary</u> for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  <u>Id.</u>

§ 1395y(a)(1)(A) (emphasis added).   Moreover, under longstanding Medicare policy, to be eligible for reimbursement, "[t]he cost of the drug or biological must represent an expense to the physician."   Medicare Benefit Policy Manual, Ch. 15, § 50.3.

The Secretary may choose to decide whether a particular drug is "reasonable and necessary" in any of three ways.   Almy v. Sebelius, 679 F.3d 297, 299 (4th Cir. 2012).   First, she may issue a national coverage determination ("NCD") that is binding throughout the entire Medicare system, including on Administrative Law Judges ("ALJs") and the Medicare Appeals Council.   Id. (citing 42 U.S.C. § 1395ff(f)(1)(B)); 42 C.F.R. §§ 405.1060(a) (4), 405.1063.

Second, one of the fifteen private insurance carriers, known as Medicare Administrative Contractors, on which Congress has directed the Secretary to rely to process Medicare claims in the first instance, see, e.g., 42 U.S.C. § 1395u, may issue a local coverage determination ("LCD") for its geographic region.   Almy, 679 F.3d at 299-300 (citing 42 U.S.C. § 1395ff(f)(2)(B)).   LCDs "set regional coverage determinations that govern in the absence of or as an adjunct to a national policy" and "help to ensure that similar claims are processed in a consistent manner within those jurisdictions."   United States v. De Los Rios, No. 10-20527, 2011 WL 346087, at *4 (S.D. Fla. Feb. 1, 2011) (citations omitted).   LCDs are not binding on the Secretary, although ALJs and the Medicare Appeals Council will accord them "substantial deference . . . if . . . applicable to a particular case."   42 C.F.R. § 405.1062(a).

Third, "'contractors may make individual claim determinations,' including whether a particular [drug] meets the statutory requirement of being 'reasonable and necessary.'"   Almy, 679 F.3d at 300 (quoting 68 Fed. Reg. 63,693).   The Secretary's choice among these three options — in particular, whether to proceed "by promulgating a generally applicable rule or by

allowing individual adjudication" — is "clearly discretionary." Heckler v. Ringer, 466 U.S. 602, 617 (1984).

## 2. Local Coverage Determinations

With respect to the development of LCDs, the Secretary has issued comprehensive guidance that Medicare contractors are bound to follow.  Under that guidance, which Plaintiff does not challenge, a drug is considered "reasonable and necessary" if it is:

- Safe and effective;
- Not experimental or investigational . . . ; and
- Appropriate . . . in terms of whether it is . . . [f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition . . . .

Medicare Program Integrity Manual ("MPIM"), Ch. 13, § 13.5.1 (emphasis added); [1] see also Almy, 679 F.3d at 300; Int'l Rehabilitative Sciences Inc. v. Sebelius, 688 F.3d 994, 997 (9th Cir. 2012).

The "accepted standards of medical practice" are determined based on:

- Scientific data or research studies published in peer-reviewed medical journals;
- Consensus of expert medical opinion (i.e., recognized authorities in the field); or
- Medical opinion derived from consultations with medical associations or other health care experts.

MPIM, Ch. 13, § 13.7.11.  Notably, the "[a]cceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community."  Id. (emphasis added); see also Almy, 679 F.3d at 300; Arruejo v. Thompson, No. 00-2402, 2001 WL 1563699, at *4 (E.D.N.Y. July 3, 2001).

LCDs are the product of extensive physician input and public comment.  Before adopting a new LCD, a Medicare contractor must provide notice and a 45-day comment period.  MPIM,

---

[1] Chapter 13 of the Medicare Program Integrity Manual is available at http://www.cms.gov/ Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c13.pdf.

Ch. 13, §§ 13.7.2, 13.7.4.  During that time, the contractor must solicit comments from providers that may be affected by the LCD, from societies of the relevant medical specialties, and from the general public.  <u>Id.</u>  The contractor must also submit the LCD for review by an advisory committee "composed of physicians, a beneficiary representative, and representatives of other medical organizations."  <u>Id.</u> §§ 13.7.4.1, 13.8.1.2; <u>see also</u> <u>Arruejo</u>, 2001 WL 1563699, at *4.  Thus, "[i]n general, an [LCD] embodies the majority view of local health care providers regarding the medical necessity of a certain good or service."  <u>De Los Rios</u>, 2011 WL 346087, at *4 (quoting <u>Arruejo</u>, 2001 WL 1563699, at *4).

### 3.     Medicare Claims Processing

In some respects, Medicare billing "operates much like private medical insurance: Medicare beneficiaries receive medical treatment and the providers submit claims for government reimbursement."  <u>Int'l Rehabilitative Sciences</u>, 688 F.3d at 997.  To be reimbursed for services rendered to a Medicare beneficiary, a provider must first submit a claim establishing that all coverage requirements are met.  42 C.F.R. §§ 424.30–424.44.  The Medicare statute and regulations explicitly require the provider to submit sufficient information to demonstrate that it is entitled to reimbursement.  42 U.S.C. § 1395*l*(e); 42 C.F.R. § 424.5(a)(6); <u>see, e.g.</u>, <u>Garcia v. Sebelius</u>, No. 10-8820, 2011 WL 5434426, at *7 (C.D. Cal. Nov. 8, 2011), <u>aff'd</u>, No. 12-55057, 2013 WL 5665189 (9th Cir. 2013).  Accordingly, "[t]he burden is on the claimant to show that [a drug] is reasonable and necessary."  <u>Int'l Rehabilitative Sciences</u>, 688 F.3d at 997; <u>accord</u> <u>Almy</u>, 679 F.3d at 305; <u>Friedman v. Sec'y of Dep't of Health & Human Servs.</u>, 819 F.2d 42, 45 (2d Cir. 1987).

Some 4.8 million Medicare claims are filed every day, by more than 1.5 million different providers and on behalf of 100 million beneficiaries.[2]   Nearly all must be processed and paid within 30 days.   See 42 U.S.C. §§ 1395h(c)(2), 1395u(c)(2).   Congress has directed the Secretary, as noted above, to rely on Medicare Administrative Contractors to take the first cut at processing these claims.   See 42 U.S.C. §§ 1395h, 1395kk(a), 1395u; 42 C.F.R. §§ 421.200, 405.904(a)(2).   Given the staggering number of claims, "[f]or reasons of administrative efficiency, [contractors] typically authorize payment on claims immediately upon receipt," without requesting the supporting medical records, "so long as the claims do not contain glaring irregularities."   Gulfcoast Med. Supply v. Sec'y, Dep't of Health & Human Servs., 468 F.3d 1347, 1349 (11th Cir. 2006) (per curiam).

However, to combat fraudulent and other improper billing practices in the Medicare program that, by some estimates, cost the government $68 billion dollars annually, see Ironworkers Local Union 68 v. AstraZeneca Pharm., 634 F.3d 1352, 1368 (11th Cir. 2011),  Congress has created a number of post-payment auditing mechanisms.  For example, Medicare Administrative Contractors may themselves "conduct post-payment audits to verify that the payments were proper" and, if not, "may suspend or recoup payment."   Id. (citing 42 U.S.C. § 1395u; 42 C.F.R. §§ 421.200(a)(2), 405.371(a)).  Other contractors, known as Recovery Audit Contractors, may analyze billing records on a more widespread basis to identify common billing errors and recover overpayments.   See 42 U.S.C. § 1395ddd(h); Palomar Med. Ctr. v. Sebelius, 693 F.3d 1151, 1156-57 (9th Cir. 2012).  And yet others, called Zone Program Integrity

---

[2] See Preventing and Recovering Medicare Payment Errors: Hearing Before the Subcommittee on Federal Financial Management, Government Information, Federal Services, and Internet of the Senate Committee on Homeland Security and Governmental Affairs, 111th Cong. (July 15, 2010) (statement of Deborah Taylor, Chief Financial Officer and Director, CMS Office of Financial Management).

Contractors, may review claims for potential fraud, waste, and abuse, which may also trigger recoupment of overpayments, as in this case.  See 42 C.F.R. § 421.304(a).

**B.       Factual and Procedural Background**

**1.       Lucentis**

Lucentis was approved by the FDA to treat neovascular (or "wet") age-related macular degeneration in 2006.  Admin. R. ("AR") 258.[3]  Lucentis is packaged in single-use, single-dose vials containing 2.0 mg (0.2 mL) of drug product.  Id. at 236.  As the FDA-approved package insert explains, when administered, the entire contents of the vial should be drawn into the syringe, and then the excess drug product should be "expelled" until the recommended dose of 0.5 mg (0.05 mL) is obtained:

> 2        DOSAGE AND ADMINISTRATION
>
> 2.3      Preparation for Administration
>
> Using aseptic technique, all (0.2 mL) of the LUCENTIS vial contents are withdrawn through a 5-micron 19-gauge filter needle attached to a 1-cc tuberculin syringe.  The filter needle should be discarded after withdrawal of the vial contents and should not be used for intravitreal injection.  The filter needle should be replaced with a sterile 30-gauge × 1/2-inch needle for the intravitreal injection.  The contents should be expelled until the plunger tip is aligned with the line that marks 0.05 mL on the syringe.

Id. at 233.  According to the drug manufacturer, Genentech Inc., "the vial contains overfill" — that is, excess drug product — "to account for loss of product when the dose is being prepared and administered appropriately and according to the FDA-approved labeling.  The vial is designed to contain enough liquid so that a single 0.5 mg (0.05 mL) dose can be

---

[3] Age-related macular degeneration ("AMD") affects the macula, a region near the center of the retina, and results in blurred central vision.  AR 431.  Neovascular (or "wet") AMD, also known as exudative senile macular degeneration, is an advanced form of AMD in which abnormal blood vessels, often leaking fluid, grow behind the retina and displace the macula.  Id.  Lucentis acts by slowing the growth of those blood vessels.

administered." Id. at 238.  Thus, when used as directed, each vial of Lucentis contains a single

dose.

The FDA-approved package insert further explains that each vial of Lucentis should be

used to treat only a single eye:

2.4     Administration

* * *

Each vial should only be used for the treatment of a single eye.  If the contralateral eye
requires treatment, a new vial should be used and the sterile field, syringe, gloves, drapes,
eyelid speculum, filter, and injection needles should be changed before LUCENTIS is
administered to the other eye.

* * *

16     HOW SUPPLIED/STORAGE AND HANDLING

Each LUCENTIS carton, NDC 50242-080-01, contains a 0.2 mL fill of 10 mg/mL
ranibizumab in a 2-cc glass vial; one 5-micron, 19-gauge x 1-1/2-inch filter needle for
withdrawal of the vial contents; one 30-gauge x 1/2-inch injection needle for the
intravitreal injection; and one package insert [see Dosage and Administration (2.4)].
VIALS ARE FOR SINGLE-EYE USE ONLY.

Id. at 236.  Thus, when used as directed, each vial of Lucentis treats only a single eye, on a single

patient.  According to the manufacturer, "the FDA-approved prescribing information does not

. . . support the practice of administering the contents of one vial of Lucentis to more than one

eye or to more than one patient.  As stated in the prescribing information, each vial of Lucentis

should only be used for the treatment of a single eye."  Id. at 238.

These labeling and administration instructions are consistent with the guidelines for safe

injection practices published by the Centers for Disease Control and Prevention ("CDC").  Since

2007, those guidelines have stated: "Do not administer medications from single-dose vials or

ampules to multiple patients or combine leftover contents for later use."  CDC, 2007 Guideline

for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings

("2007 CDC Guidelines"), at 83, <u>available at</u> http://www.cdc.gov/hicpac/pdf/isolation/Isolation 2007.pdf (last visited Feb. 7, 2014) (cited at AR 28).   As the CDC has explained, "These medications typically lack antimicrobial preservatives and can become contaminated and serve as a source of infection when they are used inappropriately."   CDC, Single-dose/Single-use Vial Position and Messages, at 2 (May 2, 2012), available at http://www.cdc.gov/injectionsafety/PDF/ CDC-SDV-Position05022012.pdf (last visited Feb. 13, 2014) (cited at AR 27-28).

It is undisputed that Plaintiff disregarded these instructions and guidelines here.

**2.      Lucentis LCDs**

The Medicare Administrative Contractor for the state of Florida, First Coast Service Options, began to consider whether to issue a LCD regarding Lucentis coverage for macular degeneration in 2007.   After conducting a period of public comment, consulting with expert ophthalmologists, and holding an advisory committee meeting, the contractor published an LCD in January 2008 that took effect the next month.   It stated that the contractor "will consider Ranibizumab (Lucentis) medically reasonable and necessary for patients with established exudative senile macular degeneration for services rendered on or after the FDA approval date." AR 121.   However, in a section titled "Indications and Limitations of Coverage and/or Medical Necessity," the LCD provided:

> Each vial should only be used for treatment of a single eye.   If the contralateral eye requires treatment, a new vial should be used.

<u>Id.</u>   Moreover, under "Utilization Guidelines," the LCD stated:

> It is expected that these services would be performed as indicated by current medical literature and/or standards of practice.   When services are performed in excess of established parameters, they may be subject to review for medical necessity.

11

Id. at 123.  Finally, the LCD noted that it "d[id] not reflect the sole opinion of the contractor," but "was developed in cooperation with advisory groups, . . . includ[ing] representatives from the Connecticut Society of Eye Physicians and the Florida Society of Ophthalmology."  Id. at 124.

In December 2008, as part of a corporate reorganization, the contractor published a revised LCD, effective February 2009.  The revised LCD was substantively unchanged.  In particular, under "Limitations," it continued to read:

> Each vial should only be used for the treatment of a single eye.  If the contralateral eye requires treatment, a new vial should be used.

Id. at 587.  Likewise, under "Utilization Guidelines," the revised LCD again stated:

> It is expected that these services would be performed as indicated by current medical literature and/or standards of practice.  When services are performed in excess of established parameters, they may be subject to review for medical necessity.

Id.  In July 2009, after becoming aware of Plaintiff's billing practices, the contractor published a local coverage article reiterating that each vial of Lucentis should be used to treat only a single eye, on a single patient.  That article stated:

> [We have] become aware of multiple patients (up to three) receiving injections from a single use vial of Lucentis.  Medicare allows for the use of a single use vial in multiple patients for certain drugs, unless the FDA label specifically precludes such use.  In the case of Lucentis, the FDA approved label specifically states, "Vials are for single eye use only," and goes on to provide explicit preparation and administration information.

Id. at 128 (emphasis added).  The article repeated the preparation and administration information found on the FDA-approved package insert and set forth above — namely, that (1) the entire contents of the vial should be drawn into the syringe, and then the excess drug product should be "expelled" until the recommended dose is obtained; and (2) each vial should be used to treat only a single eye.  Id.  Thus, consistent with the views of the drug manufacturer, the article concluded that "the FDA-approved prescribing information does not . . . support the practice of administering the contents of one vial of Lucentis to more than one eye or to more than one

patient." Id.  Moreover, the article noted that physicians who bill Medicare for multiple doses of Lucentis drawn from a single vial are "overstating [their] expense for the drug . . . and [are], therefore, overpaid," and "would be expected [to remit] a voluntary reimbursement of the overpayment" to the contractor.  Id.

### 3.   Investigation of Plaintiff

In 2008, the Zone Program Integrity Contractor ("ZPIC") for the state of Florida, SafeGuard Services LLC, conducted a proactive analysis of Medicare billing data that revealed that Plaintiff's sole physician, Dr. Salomon Melgen, "billed significantly higher for [Lucentis] in comparison to his peer group."  AR 6.  "[S]uspect[ing] that each vial of the drug [was being] administered to more than one patient," the ZPIC initiated an investigation in July 2008, and ultimately reviewed Plaintiff's billing records for nearly 1,000 patients.  AR 2143-45.  In interviews, "[Dr. Melgen] and [his] staff explained how each vial is administered [to] up to three patients," as the billing records confirmed, and as Plaintiff concedes here.  Id. at 2145; see also id. at 2042.

In June 2009, the ZPIC issued a preliminary notice of overpayment calculating that, in 2007 and 2008 alone, Plaintiff had overbilled Medicare for Lucentis by nearly $9 million.  Id. at 2145-46.  The ZPIC reasoned that Plaintiff's practice of obtaining additional doses of Lucentis from a single vial was contrary to both the instructions on the FDA-approved package insert and the governing LCD, which reiterated those instructions, and that billing Medicare multiple times for the same vial overstated the actual cost of the drug to Plaintiff.  Id. at 2144-45.  The ZPIC forwarded its findings to the Medicare Administrative Contractor, which in August 2009 issued an "initial determination" seeking to recoup the overpayment.   AR 9-10; 42 U.S.C. § 1395ff(a)(1).

### 4.      Administrative Proceedings

The initial determination of overpayment was affirmed at each of four levels of administrative review: first upon "redetermination" by the Medicare Administrative Contractor itself, 42 U.S.C. § 1395ff(b)(1)(A); then "reconsideration" by a Qualified Independent Contractor ("QIC"), id. § 1395ff(c); then review before an ALJ, id. § 1395ff(d)(1); and, finally, de novo review before the Medicare Appeals Council, a division of the Departmental Appeals Board, id. § 1395ff(d)(2); 42 C.F.R. § 405.1100.[4]

The Medicare Appeals Council's June 2013 decision is the "final decision" of the Secretary and thus the focus of this Court's review.  42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.1130.  The Council concluded that Plaintiff "failed to meet his burden of proof" to "show[] that it was medically reasonable and necessary to extract more than a single dose of Lucentis from a single use vial."  AR 24-25.  It also declined to waive recoupment of the overpayment, concluding that Plaintiff "knew or should have known that its administration of Lucentis was not consistent with accepted standards of practice," and Plaintiff therefore could not be considered "without fault" under Medicare guidelines.  Id.  Plaintiff timely appealed the Council's decision to this Court.  42 U.S.C. §§ 405(g); 1395ff(b)(1)(A).

### LEGAL STANDARDS

The Medicare statute provides that the Secretary's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g), 1395ff(b)(1)(A).  Thus, "judicial review of the Secretary's decision regarding a claim for Medicare benefits is limited to

---

[4] Notably, the QIC — which was composed of a "panel of board certified physicians and licensed registered nurses" — noted that the "[d]osage and administration of Lucentis is designed to minimize contamination of an injectable into the eye" and that Plaintiff's practice "compromises both the safe and effective administration of medications and treatments."  AR 580, 589.  The ALJ expressed a similar view, noting that Plaintiff's technique "may have compromised the safety of Medicare beneficiaries with no medical benefit" to them.  Id. at 438.

'whether there is substantial evidence to support the findings of the . . . [Secretary], and whether the correct legal standards were applied." Gulfcoast Med. Supply, 468 F.3d at 1350. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if the Court "would have reached a different result" had it been the decisionmaker. Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). It is "more than a scintilla, but less than a preponderance." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

Under the Administrative Procedure Act ("APA"), the Secretary's decision must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). As the Eleventh Circuit has explained, this standard is "exceedingly deferential." Fund for Animals v. Rice, 85 F.3d 535, 541 (11th Cir. 1996). The Court considers only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). "Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal." Fund for Animals, 85 F.3d at 541-42 (citation omitted; emphasis added). An agency decision "should be set aside in this context . . . only for substantial procedural or substantive reasons as mandated by statute, . . . not simply because the court is unhappy with the result reached." Id.

This customary deference is heightened in this case for several reasons. First, it is well recognized that the Secretary's interpretation of what is "reasonable and necessary" under the Medicare statute is entitled to Chevron deference. Gulfcoast Med. Supply, 468 F.3d at 1351. Because the Secretary is charged with administering the Medicare statute, this Court must give

"considerable weight" to her interpretation of any ambiguous language so long as it is "based on a permissible construction of the statute." Id.; see also Almy, 679 F.3d at 302.

Second, the Secretary is entitled to "substantial deference" for her interpretation of the regulations that implement the Medicare Act's "reasonable and necessary" standard. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). Thus, "the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Id. (citation omitted). "The Supreme Court has emphasized the importance of careful adherence to this standard in the Medicare context, which deals with 'a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Almy, 679 F.3d at 302 (quoting Thomas Jefferson Univ., 512 U.S. at 512).

Finally, "[b]ecause the determination of what is 'reasonable and necessary' also requires a significant degree of medical judgment, [the Court] must be mindful that '[w]hen examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'" Id. (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983)).

## ARGUMENT

I.  **THE COUNCIL'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

A.  **Plaintiff Failed to Meet its Burden to Establish that its Administration of Lucentis Was Consistent with Accepted Standards of Medical Practice**

The Council concluded that Plaintiff "failed to meet [its] burden of proof" to "show[] that it was medically reasonable and necessary to extract more than a single dose of Lucentis from a single use vial." AR 24-25. Specifically, the Council found that Plaintiff's "practice of using a single-use vial of Lucentis to treat multiple beneficiaries or multiple eyes is not appropriate

16

because it departs from accepted standards of practice." Id. at 26. That conclusion is supported by substantial evidence and merits deference from this Court.

The Council identified four principal pieces of evidence that reflect the standard of care for Lucentis. First, it pointed to the preparation and administration instructions on the FDA-approved package insert, which explain that the entire contents of the vial should be drawn into the syringe, and then the excess drug product should be "expelled" until the recommended dose of 0.5 mg (0.05 mL) is obtained. Id. They also state that "[e]ach vial should only be used for treatment of a single eye." Id. at 27. Thus, when used as directed, each vial contains a single dose and treats a single eye, on a single patient.

Second, the Council referenced the LCD for Lucentis, which reiterated portions of the package insert. Id. In particular, under "Indications and Limitations of Coverage and/or Medical Necessity," LCD explicitly provided: "Each vial should only be used for treatment of a single eye." Id. at 121. As noted earlier, LCDs are the product of extensive physician and public comment, and the Lucentis LCD specifically stated that it "d[id] not reflect the sole opinion of the contractor," but "was developed in cooperation with advisory groups, . . . includ[ing] representatives from the Connecticut Society of Eye Physicians and the Florida Society of Ophthalmology." Id. at 124. Thus, as another judge of this Court has recognized, "[i]n general, an [LCD] embodies the majority view of local health care providers regarding the medical necessity of a certain good or service." De Los Rios, 2011 WL 346087, at *4 (quoting Arruejo, 2001 WL 1563699, at *4).

Third, the Council explained that the drug manufacturer itself had expressed the view that "each vial of Lucentis should only be used for the treatment of a single eye." Id. at 238. Indeed, in a letter to the Medicare contractor, the manufacturer flatly stated that the "FDA-approved

17

prescribing information does not support the use of Lucentis vials as multi-dose vials, nor does it support the practice of administering the contents of one vial of Lucentis to more than one eye or more than one patient." Id.

Fourth, the Council observed that these standards are consistent with the CDC's guidelines for injection safety, which "call for medications labeled as 'single dose' or 'single use' to be used for only one patient." Id. at 27.  This practice, the CDC has explained, "protects patients from life-threatening infections that occur when medications get contaminated from unsafe use." Id. at 28.

On the other hand, the Council expressly noted that Plaintiff "provided no direct evidence of its own concerning the standard of care" for the administration of Lucentis. Id. at 29.  Indeed, even now, Plaintiff points to no evidence that any physician, other than Dr. Melgen himself, extracts more than one dose of Lucentis from a single vial.  Plaintiff's own practice, standing alone, clearly cannot establish the standard of care.  "Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community."  MPIM, Ch. 13, § 13.7.11 (emphasis added); see also Almy, 679 F.3d at 300; Arruejo, 2001 WL 1563699, at *4.

Thus, the Council properly found that Plaintiff failed to meet its burden to establish that its administration of Lucentis was consistent with accepted standards of medical practice.

**B.**    **Plaintiff Fails to Demonstrate that the Council's Decision Rested on Irrelevant or Improper Evidence**

Plaintiff's attempt to show that the evidence considered by the Council was irrelevant or improper fails at each turn.

     **1.**    **The FDA-approved package insert is an authoritative document that, at a minimum, contains relevant and useful information bearing on the standard of care**

First, Plaintiff argues that, "as a matter of law," the FDA-approved package insert cannot be considered evidence of "accepted standards of medical practice." Pl.'s Mem. 24. That is plainly incorrect. While Plaintiff correctly notes that no law requires a physician to blindly follow the FDA label, it does not follow that the label is irrelevant to determining the accepted standards of medical practice. On the contrary, in medical malpractice cases, "Virtually every court addressing this question has concluded that the drug's labeling and PDR[5] reference are relevant to the standard of care issue." Richardson v. Miller, 44 S.W.3d 1, 15 (Tenn. Ct. App. 2000). Indeed, the "majority view" is that the FDA-approved labeling, while not conclusive, provides "relevant and useful information regarding the prescribing physician's standard of care." Hyman & Armstrong P.S.C. v. Gunderson, 279 S.W.3d 93, 114 (Ky. 2008) (collecting cases). In other words, although the label is "not designed per se to establish a medical standard of care, [it] can be given weight as [an] 'authoritative published compilation by a pharmaceutical manufacturer.'" Morlino v. Med. Ctr. of Ocean County, 684 A.2d 944, 949 (N.J. App. Div. 1996) (quoting Thompson v. Carter, 518 So. 2d 609, 613 (Miss. 1987)). The "minority view" gives the FDA-approved labeling even greater weight, holding that "it is prima facie evidence of the standard of care." Hyman, 279 S.W.3d at 114 n.3 (emphasis added); see, e.g., Haught v. Maceluch, 681 F.2d 291, 303 n.12 (5th Cir. 1982) (concluding that "the Physician's Desk Reference adequately establishes . . . the standard of care for the administration of [a drug]") (emphasis added).

---

[5] The PDR, or Physician's Desk Reference, is a "standard medical reference" that contains, among other things, the labeling information for all FDA-approved drugs. Newmann v. United States, 938 F.2d 1258, 1260 (11th Cir. 1991).

Thus, it is clear that the FDA-approved package insert is, at a minimum, "relevant and useful evidence" regarding the accepted standards of medical practice.  Richardson, 44 S.W.3d at 15.  And the Court need not determine whether that information could be conclusive here, for it does not stand alone.

## 2.  The Lucentis LCD unambiguously limited coverage of a single vial to use on a single eye, on a single patient

Second, Plaintiff contends that, even if the FDA-approved labeling were clear that each vial of Lucentis treats only a single eye, on a single patient, the LCD was not.  Pl.'s Mem. 23.  Specifically, Plaintiff argues:

> The only administration instruction actually incorporated from the FDA labeling into the Original Lucentis LCD spoke to the treatment of an individual patient's "contralateral eye."  On its face, this language does not, as the [Council] asserts, address the propriety of multi-dosing Lucentis from single-use vials for ***administration to multiple patients***.  Instead, it simply advises physicians to use a new vial when treating the other ("contralateral") eye on the ***same patient***.

Id. (citations omitted; emphases in original).  That is, to put it charitably, a selective reading of the LCD.  In fact, under the heading "Indications and Limitations of Coverage and/or Medical Necessity," the LCD stated:

> Each vial should only be used for the treatment of a single eye.  If the contralateral eye requires treatment, a new vial should be used.

AR 121 (emphasis added).  Thus, the LCD explicitly limits coverage of "[e]ach vial" to treatment of a "single eye."  Id.  Plaintiff's argument to the contrary not only strains ordinary usage but defies basic anatomy.  Unless Plaintiff has "multiple patients" who share a "single eye," like the Graeae of Greek myth, the LCD plainly precludes coverage of its practice.  Plaintiff's argument also produces senseless results.  On its reading, the LCD would require a physician, after injecting a patient's left eye, to use a new vial on that patient's right eye, but

would then permit the physician to reuse both vials on up to three <u>other</u> patients.  That cannot be its meaning.

Relatedly, Plaintiff suggests that, despite this explicit "single eye" limitation, the LCD was unclear because it did not also repeat the "expel" instruction from the package insert.  Pl.'s Mem. 23-24.  But LCDs are intended to be "clear, concise" documents that "assist providers in submitting correct claims for payment."   MPIM, Ch. 13, §§ 13.1.3, 13.5.   There is no requirement that they reproduce the FDA-approved labeling, which physicians are presumed to read, or delineate every element of the standard of care.  Indeed, the Lucentis LCD expressly noted that treatment must "be performed as indicated by current medical literature and/or standards of practice" and, if not, "may be subject to review for medical necessity."  AR 123. And information in the package insert is "relevant and useful evidence" of those standards, regardless of whether it is repeated in an LCD.  <u>Richardson</u>, 44 S.W.3d at 15.  At bottom, the burden to establish that a drug is "reasonable and necessary" — including that its administration is consistent with "accepted standards of medical practice" — falls not on the Medicare contractor, but on the physician.  <u>See, e.g.</u>, <u>Int'l Rehabilitative Sciences</u>, 688 F.3d at 997.

### 3.    A drug manufacturer is presumed to be an expert in its own products, and its views on the standard of care for Lucentis are plainly relevant

Third, Plaintiff attempts to dismiss, in a footnote, the views of the drug manufacturer as "irrelevant for purposes of this appeal."  Pl.'s Mem. 26 n.15.  It makes no attempt to explain why, and it is difficult to fathom.  A drug manufacturer is widely presumed to be an expert in its own products, not only because of the intensive research required to bring a drug to market, but also because it faces substantial liability for failure to warn of any risks.  <u>See, e.g.</u>, <u>Reyes v. Wyeth Labs.</u>, 498 F.2d 1264 (5th Cir. 1974) ("A drug manufacturer is . . . presumed to possess

an expert's knowledge of the . . . administration of pharmaceutical products.");[6] Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 855 n.2 (10th Cir. 2003) (a "'drug manufacturer is held to be an expert in its particular field and is under a continuous duty to keep abreast of scientific developments touching upon the manufacturer's product'") (citation omitted).  And, as the Supreme Court has explained, it is in fact the manufacturer — not the FDA — that is principally responsible for the contents of the drug label.  Wyeth v. Levine, 555 U.S. 555, 570-71 (2009) (rejecting the "fundamental misunderstanding" that "the FDA, rather than the manufacturer, bears primary responsibility for drug labeling" and explaining that "it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times").  Thus, courts have sensibly given "authoritative" weight to a manufacturer's drug label, see, e.g., Morlino, 684 A.2d at 949, and Plaintiff offers no reason to give the Lucentis manufacturer's statements here less consideration.

### 4.    The CDC injection safety guidelines were part of the record, and have warned against the use of single-dose vials on multiple patients since 2007

Fourth, Plaintiff argues that the CDC guidelines cannot be considered evidence of the standard of care for Lucentis because, it asserts, they were not part of the administrative record and were not adopted until 2012, after the period covered by the overpayment determination.  Plaintiff is wrong on both counts.

To begin, the CDC guidelines were, in fact, part of the record, before both the ALJ and the Council.  Indeed, it was Plaintiff itself who submitted them during both proceedings.  Plaintiff's May 2011 supplemental memorandum to the ALJ (AR 554-1038) included a CDC

---

[6] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

publication titled "Injection Safety FAQs for Providers." Id. at 594-601. That document included the following question and answer:

> Is it acceptable to use single-use medication vials or pre-filled syringes for more than one patient?
>
> NO. Medication vials that are labeled for single-use and pre-filled medication syringes should never be used for more than one patient.

Id. at 597. In addition, Plaintiff's November 2012 supplemental submission to the Council (id. at 276-377) included a CMS memorandum referencing the CDC guidelines:

> CMS expects providers and suppliers to comply with nationally recognized standards for infection control practices. . . . Among these standard practices is the expectation that medications labeled as SDVs [single-dose vials] must not be used for multiple patients, due to the risk of spreading infectious diseases. . . . [T]his practice of reuse is in conflict with nationally recognized standards (such as those issued by the Centers for Disease Control and Prevention (CDC)).

Id. at 362. And in the same submission, as well as in an April 2013 submission to the Council, Plaintiff included a revised LCD referencing the CDC guidelines:

> Coding guidelines updated to incorporate CDC guidelines . . . as follows: "Even if a single-dose or single-use vial appears to contain multiple doses or contains more medication than is needed for a single patient, that vial should not be used for more than one patient nor stored for future use on the same patient."

Id. at 135, 144, 374. Thus, Plaintiff's contention that the CDC guidelines were not part of the record below is demonstrably wrong.

Equally mistaken is Plaintiff's assertion that the relevant CDC guidelines were not adopted until 2012, and thus have no bearing on the standard of care in 2007 and 2008. Plaintiff appears to concede that the CDC's injection safety guidelines "have been part of Standard Precautions since 2007." Pl.'s Mem. 31. Plaintiff argues, however, that the 2007 guidelines "only address concerns" about reusing needles and "do not address multi-dosing." Id. at 31-32

(citing 2007 CDC Guidelines at 68).  That is, once again, a selective reading.  In fact, the 2007 guidelines also state flatly:

> Do not administer medications from single-dose vials or ampules to multiple patients or combine leftover contents for later use.

2007 CDC Guidelines at 83.  That is entirely consistent with the CDC's 2012 position statement, which, as the Council observed, "call[s] for medications labeled as 'single dose' or 'single use' to be used for only one patient."  AR 27.  Thus, Plaintiff's assertion that the Council improperly considered the CDC guidelines is unfounded.

### 5. Plaintiff fails to demonstrate that the Council improperly relied on so-called "hearsay"

Plaintiff's assertion that the Council improperly relied on a statement submitted by the Medicare Administrative Contractor during supplemental briefing is a red herring.  Contrary to Plaintiff's assertions, the Council neither mischaracterized the contractor's statement nor committed procedural error in considering it.  In any event, because Plaintiff fails to show that any alleged error affected the outcome, there is no reason to upset the Council's decision on this basis.

First, Plaintiff's suggestion that the Council misconstrued the contractor's statement is pure hyperbole.  During supplemental briefing, the Council asked the Medicare Administrative Contractor for its views on whether Plaintiff should be granted a waiver of liability.  The contractor responded that a waiver was unwarranted, in part because:

> The co-chair of [the advisory committee] is a practicing ophthalmologist.  As a representative of his society, he received no questions to my knowledge in regard to the off-label administration of Lucentis from [Plaintiff] or anyone else during the adjudication of the claims in question in this case.  There is an established standard of care, which is to use the vial per the FDA approved indication and vial package instructions that clearly dictate for SINGLE EYE USE ONLY.

AR 255.  In other words, in the contractor's view, the FDA-approved labeling reflected the established standard of care for Lucentis, and the co-chair of the advisory committee, himself an ophthalmologist, had "received no questions" to suggest otherwise.  In its decision, the Council paraphrased the contractor's response as follows:

> [The advisory committee co-chair] is unaware of any accepted practice within the medical committee to deviate from the standard of care represented by the product labeling when administering Lucentis.

Id. at 29.  Thus, the Council's interpretation was far from the "complete[] mischaracteriz[ation]" that Plaintiff claims, Pl.'s Mem. 32; on the contrary, it was an entirely reasonable interpretation of the contractor's response.  Under the substantial evidence standard, even if the contractor's response were "susceptible to more than one rational interpretation," the Court must defer to the Council's findings.  Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

Second, Plaintiff's contention that the Council committed "procedural error" by referencing the contractor's response, which Plaintiff alleges to contain hearsay, is mistaken.  To begin, Plaintiff fails to show that the contractor's response is, in fact, hearsay.  Hearsay is a declarant's out-of-court "statement" offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  But the contractor's response, by its own terms, is based on the contractor's own knowledge, not on a statement uttered by the advisory committee co-chair, and thus does not meet the hearsay definition.  See id.

Regardless, the Federal Rules of Evidence do not apply to administrative proceedings before the agency.  See 42 U.S.C. § 405(b); 42 C.F.R. § 405.1036(e).  And although there are due process limits on the extent to which hearsay may constitute "substantial evidence" in administrative proceedings, see Basco v. Machin, 514 F.3d 1177, 1182 (11th Cir. 2008), Plaintiff waived any due process argument by failing to raise it before the agency in the first

instance.  See, e.g., Mahon v. USDA, 485 F.3d 1247, 1254-55 (11th Cir. 2007) ("Under ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency.").  The contractor submitted its response to the Council on March, 25, 2013.  AR 259-63, 253-56.  More than two weeks later, on April 11, 2013, Plaintiff submitted its own brief that expressly took "the opportunity to respond" to the contractor's submission.  AR 67.  Plaintiff made no objection — on due process grounds or otherwise — to the contractor's response, and therefore waived the argument.  AR 89-90.

Third, even if there was error — and there was not — Plaintiff fails to demonstrate that it affected the outcome.  "In administrative law, as in federal civil and criminal litigation, there is a harmless error rule."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 659-60 (U.S. 2007) (quoting PDK Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004)).  In reviewing agency action, courts must take "due account . . . of the rule of prejudicial error."  5  U.S.C. § 706; see also Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect a party's substantial rights."); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (applying "harmless error" analysis under the "substantial evidence" standard in 42 U.S.C. § 405(g)).  "[T]he harmless error rule requires the party asserting error to demonstrate prejudice from the error."  First Am. Discount Corp. v. CFTC, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (citation omitted).  "If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."  PDK Labs., 362 F.3d at 799.

The Council's decision did not rise or fall on the contractor's response, as Plaintiff appears to claim.  Rather, as explained above, that decision principally relied on four pieces of evidence.  As the Council itself put it: "The standard for the appropriate administration of

Lucentis, as set forth in [1] the product labeling and reinforced by [2] LCD L26237, as well as [3] the manufacturer's explanatory letter, is also consistent with [4] general guidelines for injection safety promulgated by the CDC."  AR 27.  To be sure, the Council also "note[d]" the contractor's response, as well as Plaintiff's "concerns about the reliability of this representation."  Id. at 29.  But, at bottom, it explained that Plaintiff had "produced no evidence of its own concerning the standard of care" for the administration of Lucentis, id. at 28-29, and therefore failed to meet its burden of proof, id. at 24.  Thus, even setting aside the contractor's response, the record evidence amply supports the Council's decision, particularly given that Plaintiff simply provided no evidence on the other side of the ledger.  See Bloodsworth, 703 F.2d at 1239 (substantial evidence is "more than a scintilla, but less than a preponderance").

Even now, Plaintiff points to no evidence to show that any physician, other than its own, administers Lucentis in this manner.  To demonstrate prejudice from an alleged procedural error, Plaintiff "'must indicate with reasonable specificity' the aspect of the rul[ing] to which it objects and 'how it might have responded if given the opportunity.'"  Miami-Dade County v. EPA, 529 F.3d 1049 (11th Cir. 2008) (citation omitted).  The "petitioner must demonstrate that 'on remand, [it] can mount a credible challenge . . . and [was] thus prejudiced by the absence of an opportunity to do so before the agency.'"  Id. (citation omitted).  Plaintiff vaguely suggests that it was prejudiced because it was "left . . . without the opportunity" to refute the contractor's response "through testimony, affidavit, or subpoena."  Pl.'s Mem. 33.  But, as noted above, Plaintiff did file a response to the contractor's statement, yet raised no objection.  AR 89-90. And Plaintiff still fails to identify what particular evidence, if any, it would submit to refute the contractor's statement.  Thus, even if the Council's consideration of the contractor's statement was error — and it was not — Plaintiff fails to demonstrate prejudice.

### C.   Plaintiff Fails to Demonstrate that the Council Departed from Agency Policy or Precedent Without Adequate Explanation

Plaintiff's remaining challenges to the evidentiary basis for the Council's decision amount to arguments that the Council departed from agency policy or precedent without explanation.  None is persuasive.

### 1.   The Council's decision is consistent with Medicare guidance on reimbursement for discarded drugs and biologicals

Plaintiff first argues that the Council's decision is inconsistent with a provision of the Medicare Claims Processing Manual ("MCPM") addressing reimbursement for "Discarded Drugs and Biologicals" — which, Plaintiff appears to contend, demonstrates that "multi-dosing" is an accepted medical practice across the board.  Pl.'s Mem. 24-26.  That is incorrect.  In 2007 and 2008, that provision provided:

> The CMS encourages physicians, hospitals and other providers to schedule patients in such a way that they can use drugs or biologicals most efficiently, in a clinically appropriate manner.  However, if a physician, hospital or other provider must discard the remainder of a single use vial or other single use package after administering a dose/quantity of the drug or biological to a Medicare patient, the program provides payment for the amount of drug or biological discarded along with the amount administered, up to the amount of the drug or biological as indicated on the vial or package label.

MCPM, Ch. 17, § 40 (emphasis added). [7]   That provision recognizes that, under certain circumstances, it may be considered appropriate to administer the contents of a single-use vial to multiple patients.  For example, some drugs, like Botox, are packaged in relatively large single-use vials that, when used as directed, contain far more than a single dose of drug product.  The key consideration, which Plaintiff overlooks, is whether administration to multiple patients is "clinically appropriate" for the particular drug in question.

---

[7] Chapter 17 of the Medicare Claims Processing Manual is available at http://www.cms.gov/ Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c17.pdf

28

CMS's response to the "frequently asked question" whether Medicare would "pay for a drug from a single dose vial if . . . administered to more than one beneficiary" is fully consistent with that provision.  There, CMS reiterated that reimbursement would depend on whether the drug was administered in a "clinically appropriate manner."  AR 356.  That, it explained, turns "on numerous factors, including, but not limited to: approved labeling, State law, the setting in which the product is prepared and used, how the product is stored, sterility, and chemical stability."  Id.  Again, the central inquiry is whether the practice is "clinically appropriate" for the drug in question.

Thus, Plaintiff's insistence that if Medicare covers <u>one</u> "multi-dosed" drug (such as Botox) it is required to cover <u>all</u> "multi-dosed" drugs (including Lucentis) is fundamentally mistaken.  What is "clinically appropriate" for one drug may not be for another.  Thus, as the Council concluded, Plaintiff's comparison to Botox is "inapposite."  AR 29.  While both Botox and Lucentis are packaged in "single-use" vials, the similarity ends there.  Botox is packaged as a vacuum-dried powder that the physician must first "reconstitute" by mixing with saline solution.  <u>Id.</u> at 607.  Once reconstituted, the drug must be used within 24 hours, <u>id.</u> at 620, 621 — and that is the sense in which it is a "single-use" product.  In contrast to Lucentis, the recommended dose of Botox varies depending on the condition being treated.  <u>Id.</u> at 622-23.  Thus, the Botox package insert does not direct the physician to withdraw the entire contents of the vial into a syringe and then to "expel" the excess drug product to obtain the recommended dose.  <u>Id.</u> at 620.  And, again in contrast to Lucentis, the Botox package insert "does not specify that the contents of a vial of Botox may only be used to treat a single beneficiary or a single

anatomic site." Id. at 29.[8]   Indeed, it specifically contemplates that multiple doses may be extracted from a single vial, noting that "[a] new, sterile needle and syringe should be used to enter the vial on each occasion for the removal of Botox." Id. at 620.

In view of these differences, it is hardly inconsistent to conclude that what may be "clinically appropriate" for Botox is not for Lucentis.  And this is reflected in clinical practice: Plaintiff does not appear to dispute that it is relatively common for physicians to obtain multiple doses of Botox from a single vial, but identifies no physician, other than its own, who does so with Lucentis.

### 2.   The Council's decision did not depart from the Medicare contractor's local coverage article for Lucentis

Plaintiff next argues that the Council's decision departed without adequate explanation from a local coverage article published by the Medicare Administrative Contractor that, Plaintiff asserts, "recognized the appropriateness" of Plaintiff's administration and billing practices for Lucentis. Id. at 26.  As an initial matter, that is a curious interpretation of an article that, in fact, singles out Plaintiff's practices as "specifically preclude[d]" by the FDA-approved package insert and expressly states that "each vial of Lucentis should only be used for the treatment of a single eye." AR 128.  Regardless, the legal principle that Plaintiff invokes has no application here.

Even if the Medicare Administrative Contractor's article had specifically endorsed Plaintiff's practices, it could not be considered binding agency precedent.  The Council is not bound by an LCD, let alone an article.  42 C.F.R. § 405.1062.  Rather, it is charged with

---

[8] Plaintiff suggests that the Council was mistaken on this score and that "the Botox label specifically states that it is for 'Single Patient Use.'" Pl.'s Mem. 26 (emphasis deleted).  In fact, although the Botox box is marked "Single Patient Use," the package insert — which contains the prescribing information and is commonly referred to as the FDA-approved label — contains no such limitation.

undertaking a "de novo" review, see 42 U.S.C. § 1395ff(d)(2)(B); 42 C.F.R. § 405.1100(d), "which is incompatible with [Plaintiff's] proffered notion that the [Council] is somehow obligated to defer to the outcomes of prior decisions below" by agency contractors.  Almy, 679 F.3d at 310.  Only the Council's decision is the "final decision" of the Secretary and, thus, the agency.  42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.1130; see Almy, 679 F.3d at 310.  And Plaintiff points to no Council decision finding that it is "reasonable and necessary" or "clinically appropriate" to obtain multiple doses of Lucentis from a single vial.  This Court "therefore cannot conclude that 'the agency has failed to explain its departure from prior precedent,' such that the [Council's] decisions are deprived of deference, because there simply was no contrary precedent from which the agency departed."  Almy, 679 F.3d at 310 (quoting Bush-Quayle '92 Primary Comm. Inc. v. FEC, 104 F.3d 448, 453, (D.C. Cir. 1997)) (internal citation omitted).

### 3.    The Council's decision is consistent with Medicare guidance on reimbursement for off-label uses

Finally, Plaintiff argues that the Council's decision establishes a "new" requirement of "strict compliance" with the FDA label that is inconsistent with Medicare guidance permitting reimbursement for off-label uses of FDA-approved drugs under certain circumstances.  Pl.'s Mem. 6, 24.  That, too, is incorrect.

To begin, the Council established no such overarching rule, and there is no reason to give its decision that broad reading.  The question before the Council was a narrow one: whether the particular "item[] or service[]" that Plaintiff provided — the administration of a single vial of Lucentis to more than one patient — was "reasonable and necessary" under the circumstances. 42 U.S.C. §  1395y(a)(1)(A).  Its conclusion was similarly narrow: Plaintiff's "practice of using a single-use vial of Lucentis to treat multiple beneficiaries or multiple eyes is not appropriate because it departs from accepted standards of practice."  AR 26.  The Council did not purport to

31

address what may be "reasonable or necessary" for other drugs, or the "acceptable standards of practice" for their administration.

Moreover, the Council's decision is entirely consistent with Medicare guidance on reimbursement for off-label uses of FDA-approved drugs.  The Medicare Benefit Policy Manual ("MBPM") provides:

> An unlabeled use of a drug is a use that is not included as an indication on the drug's label as approved by the FDA.  FDA approved drugs used for indications other than what is indicated on the official label may be covered under Medicare if the carrier determines the use to be medically accepted, taking into consideration the major drug compendia, authoritative medical literature and/or accepted standards of medical practice. . . .

> These decisions are made by the contractor on a case-by-case basis.

MBPM, Ch. 15, § 50.4.2 (emphasis added).[9]  As an initial matter, that policy has no application here because Plaintiff was engaged not in an off-label use, but in a labeled one: its physician concededly administered the drug for neovascular AMD, "an indication on the drug's label as approved by the FDA."  Id.; see Pl.'s Mem. 8.  Regardless, even if Plaintiff's use could be considered off-label, the Council's decision here dovetails with this guidance: under both, the inquiry turns on the accepted standards of practice for the particular drug in question.  Plaintiff produced no evidence that its use of Lucentis, which is contrary to both the drug's FDA-approved labeling and the Lucentis LCD, is nonetheless within the accepted standards of practice for Lucentis.

Plaintiff's reliance on two particular examples of off-label uses — Avastin and Kenalog (or Triesence) — is unavailing.  Plaintiff argues that the Council's decision is inconsistent with "Medicare policy" to cover Avastin and Kenalog when used off-label to treat neovascular AMD.

---

[9] Chapter 15 of the Medicare Benefit Policy Manual is available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf.

Pl.'s Mem. 28-30.  But what Plaintiff describes as "Medicare policy" are, in fact, simply local decisions of Medicare contractors — an LCD for Avastin and a local coverage article for Kenalog.  Id. at 28 (citing AR 772-73); id. at 30 (citing AR 77).  As discussed above, neither an LCD nor an article binds the Council or constitutes agency precedent.  42 C.F.R. § 405.1062.  Plaintiff points to no Council decision addressing the question whether off-label use of Avastin or Kenalog is consistent with accepted standards of medical practice.[10]  Thus, there is no failure to explain a departure from agency precedent, for there "'simply was no contrary precedent from which the agency departed.'"  Almy, 679 F.3d at 310 (citation omitted).[11]

## II.   THE COUNCIL'S DECISION DOES NOT RETROACTIVELY IMPOSE A NEW MEDICARE REIMBURSEMENT POLICY IN VIOLATION OF DUE PROCESS OR THE APA

Unable to show that the Council's decision was unsupported by substantial evidence, Plaintiff attempts to lead the Court down the proverbial rabbit hole.  Its principal fallback argument is that the Council exceeded its authority under the Medicare Act by promulgating a new Medicare reimbursement "policy" for Lucentis, then retroactively applied that policy to Plaintiff in violation of its due process rights.  This argument is meritless.

---

[10] Likewise, Plaintiff provides no evidence that off-label use of Avastin and Kenalog lacks support in compendia and medical literature.  Indeed, the Avastin LCD cited by Plaintiff refers to published reports and widespread clinical use of Avastin administered intravitreally.  See AR 773.  Plaintiff has submitted no comparable support for Lucentis.

[11] Nothing in the Medicare Benefit Policy Manual provision cited in the text — which emphasizes that these determinations are made on a "case-by-case basis" — necessarily prohibits reimbursement for off-label use of Avastin or Kenalog to treat neovascular AMD.  Moreover, there are significant differences between those two drugs and Lucentis that would bear on whether their administration to multiple patients from a single-use vial is consistent with "accepted standards of medical practice."  For example, in contrast to Lucentis, the Avastin package insert does not explicitly provide that a single vial should be used to treat a single patient or single anatomic site, AR 786-87; likewise, the Kenalog package insert does not direct the physician to withdraw the entire contents of the vial and then "expel" the excess drug product to obtain the recommended dose, id. at 188, 206.

First, Plaintiff's claim that the Council exceeded its authority by "promulgating a <u>policy</u>," <u>see</u> Pl.'s Mem. 35 (emphasis added), is baffling given that Plaintiff does not dispute (nor could it) that the Council reached the challenged decision after a lengthy agency <u>adjudication</u> process (as opposed to a rulemaking) in which Plaintiff participated.  <u>See id.</u> at 14-20.   The Medicare statute and regulations expressly authorize the Council to review appeals from overpayment determinations such as this one.  <u>See</u> 42 U.S.C. § 1395ff(d)(2); <u>see also</u> 42 C.F.R. § 405.1102 <u>et seq.</u>

Second, there is no merit to Plaintiff's contention that the Council's decision somehow constitutes a generally applicable policy.  <u>See</u> Pl.'s Mem. 35-36.  As the Fourth Circuit recently reasoned in rejecting a similar argument, "[t]he purported 'policy' in this case is nothing more than the accretion of individual decisions finding that the [medical device] does not meet the statutory [medically reasonable and necessary] requirements for [Medicare] coverage."  <u>Almy</u>, 679 F.3d at 303.  That reasoning has even greater force here, where there is no "accretion" of Council decisions, but rather one Council decision standing alone.  The Secretary's regulations make clear that the Council's adjudicative decisions are binding only on the parties to the administrative process.  <u>See</u> 42 C.F.R. § 405.1062 (Council decision "applies only to the specific claim being considered and does not have precedential effect").  Thus, the Council's resolution of Plaintiff's appeal is binding only on Plaintiff and no other providers, and does not constitute a generally applicable policy.  <u>See id.</u>

Third, Plaintiff's claim that the Council "retroactively imposed" its decision on Plaintiff, <u>see</u> Pl.'s Mem. 34, is profoundly misguided.  Contrary to Plaintiff's protestations, there is a "presumption of retroactivity for adjudications" and, in fact, it is "'the norm in agency adjudications no less than in judicial adjudications.'"  <u>Qwest Servs. Corp. v. FCC</u>, 509 F.3d 531,

539 (D.C. Cir. 2007) (internal citation omitted); see also Catholic Health Initiatives Iowa Corp. v. Sebelius, 718 F.3d 914, 921 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that adjudications are inherently retroactive."). That is because "[a]djudication deals with what the law was," while "rulemaking deals with what the law will be." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 221 (1988) (Scalia, J., concurring) (emphasis added). Thus, Plaintiff's reliance on cases that deal with the retroactive imposition of new policies or regulations, which generally have prospective effect, is misplaced. See Pl.'s Mem. 35-36 (citing FCC v. Fox TV Stations Inc., 132 S. Ct. 2307 (2012), and Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156 (2012)). Here, the Council did not articulate a new policy, nor did it depart from a prior interpretation; it applied existing policy to a particular factual situation, which is well within its mandate. See, e.g., Alaska Dep't of Health & Soc. Servs. v. CMS, 424 F.3d 931 (9th Cir. 2005) ("The authority to elucidate the meaning of the statute in this manner, via case-by-case adjudication, is well within the Secretary's mandate.").

Moreover, Plaintiff's complaint that it had "no notice" of the Lucentis coverage requirements is belied by the record. It bears repeating that the Medicare Act places "[t]he burden . . . on the claimant to show that [a drug] is reasonable and necessary." Int'l Rehabilitative Sciences, 688 F.3d at 997. Here, the Council explicitly found that Plaintiff "knew" or "should have known" that its practice of using a single-use vial of Lucentis to treat multiple beneficiaries was not medically reasonable or necessary. As discussed further below, see infra Part IV, this is particularly true given that the Lucentis package insert has been clear since 2006; the CDC guidelines have been clear since at least 2007; and the Lucentis LCD — which explicitly stated, as a "Limitation[] of Coverage," that "[e]ach vial should only be used for treatment of a single eye" — has been clear since January 2008. This evidence directly

refutes Plaintiff's claim that it had "no notice" about whether administering multiple doses of Lucentis from a single vial was consistent with the standard of care.[12]

Thus, the Council was well within its statutory and regulatory authority to find that Plaintiff's practice of treating multiple patients with a single vial of Lucentis was not medically reasonable and necessary and therefore not covered by the Medicare Act.  Further, the record belies Plaintiff's claim that it lacked notice that its practice was not medically reasonable and necessary.  Taken to its logical extension, Plaintiff's argument "would be effectively to require the Secretary to issue item-specific coverage rules for each and every [FDA-approved drug] before issuing case adjudications," which would "'stultify the administrative process.'"  Almy, 679 F.3d at 304 (internal citation omitted); see also Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 96 (1995) ("[There is no] basis for suggesting that the Secretary has a statutory duty to promulgate regulations that . . . address every conceivable question in the process of determining equitable reimbursement.").  This Court should decline Plaintiff's invitation to do so.[13]

---

[12] That the Council rendered its decision at the end of a lengthy administrative process further undermines Plaintiff's argument that the challenged decision violates its due process rights.  As an initial matter, Plaintiff makes no attempt to establish that it has a recognized property interest in receiving Medicare reimbursement payments, a question that is not settled in the least.  See Jordan Hosp. Inc. v. Shalala, 276 F.3d 72, 78 (1st Cir. 2002).  Moreover, "there is nothing in the Medicare Act which would . . . le[ad] a reasonable physician to believe that he might be entitled to" an overpayment for the services provided.  Painter v. Shalala, 97 F.3d 1351, 1358 (10th Cir. 1996); see also Trustees of Mease Hosp., Inc. v. Sebelius, No. 09-1795, 2010 WL 3222097, at *9 (M.D. Fla. July 26, 2012) (same).  In any event, the adjudicative process established under the Medicare statute to resolve appeals from overpayment determinations afforded Plaintiff sufficient procedural protections.  See Jordan Hosp., 276 F.3d at 78; see also Almy, 697 F.3d at 312 (observing that the Secretary "has created an exhaustive review process ensuring that claimants will have repeated and extensive opportunities to ensure that compliant claims are properly reimbursed").

[13] Plaintiff's argument that the Council's decision is arbitrary and capricious because it "conflicts with other CMS guidance" is discussed in the preceding section.  See supra Part I.C.

### III. THE CHALLENGED DECISION DOES NOT MODIFY THE PAYMENT RATE FOR LUCENTIS IN VIOLATION OF THE MEDICARE ACT

Plaintiff's argument that the Council's decision altered the statutory reimbursement formula for Lucentis is also meritless.  See Pl.'s Mem. 37-39.  As explained above, the Medicare statute extends coverage "only to those medical services that are medically 'reasonable and necessary' for the beneficiary," Gulfcoast Med. Supply, 468 F.3d at 1349 (quoting 42 U.S.C. § 1395y(a)(1)), and requires the Secretary to deny claims that fail to satisfy that standard. Plaintiff argues that the statute authorizes the Secretary to make a "'binary choice'" — to determine that "'either an item or service is reasonable and necessary, in which case it may be covered at the statutory rate, or it is unreasonable or unnecessary, in which case it may not be covered at all.'"  Pl.'s Mem. 37 (quoting Hays v. Sebelius, 589 F.3d 1279, 1283 (D.C. Cir. 2009)) (emphasis deleted).  But that is precisely what the Council has done here.  It determined that Lucentis was reasonable and necessary, and thus would be reimbursed at the statutory rate, only where each vial was used to treat a single eye, on a single patient, consistent with the standard of care.  AR 31.

Plaintiff's reliance on Hays, an out-of-circuit decision, to attempt to convince this Court that the Council somehow "modif[ied] the payment rate" for Lucentis in violation of 42 U.S.C. § 1395y(a)(1) is misplaced.  In that case, a Medicare beneficiary sought reimbursement for an inhalation drug that was a combination of two separate drugs and that was slightly more expensive than separate doses of the two component drugs.  Hays, 589 F.3d at 1280.  Rather than reimburse the beneficiary for the (slightly more expensive) cost of the combination drug, a regional Medicare contractor decided instead to base reimbursement on the least costly medically appropriate alternative, that is, the cost of the two component drugs administered separately.  Id.

On appeal, the D.C. Circuit held that the Secretary lacks "authority to partially cover an item or service based on the price of its least costly alternative."  Id. at 1283.

By contrast, here, the Secretary has not partially covered an item or service based on the price of its least costly alternative.  Instead, the Secretary's decision makes clear that Medicare will reimburse Plaintiff for the cost of a single 0.5 mg dose of Lucentis used to treat a single eye, on a single patient, which "represents payment in full for all of the drug intended to be extracted and administered from a single-use vial," consistent with the standard of care.  AR 30.  That is precisely the amount to which Plaintiff is entitled under the Medicare statute.  The Council's conclusion that Plaintiff is not entitled to reimbursement for additional Lucentis injections extracted from a single-use vial is not, as Plaintiff argues, a modification of the statutory payment rate for Lucentis.  Rather, it is simply a claim denial based on the Council's determination that those injections are not covered by Medicare (and therefore not eligible for reimbursement) because they are not medically reasonable and necessary.  Id. at 30-31.  For these reasons, Plaintiff's attempt to invoke the rationale from Hays to convince this Court that it is entitled to reimbursement for 3 to 4 times its actual cost for the drug must fail.

## IV.   THE COUNCIL'S DETERMINATION THAT PLAINTIFF WAS NOT ENTITLED TO A WAIVER OF LIABILITY IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Finally, the Council declined to waive recoupment of the overpayment, concluding that Plaintiff "knew or should have known that its administration of Lucentis was not consistent with accepted standards of practice," and Plaintiff therefore could not be considered "without fault" under Medicare guidelines.  That determination is supported by substantial evidence and merits deference from this Court.  See Owens v. Heckler, 748 F.2d 1511, 1514 (11th Cir. 1984) ("[W]e are to determine whether substantial evidence supports the Secretary's conclusion that the claimant was not without fault in causing the overpayment.").

38

In its decision, the Council stated that, under the Medicare statute, recoupment may be waived "if the provider or supplier was without fault in receiving the overpayment."  AR 33 (citing 42 U.S.C. § 1395gg(b)(1)).  Medicare guidance provides that:

> [A] provider [is] without fault[] if it exercised reasonable care in billing for, and accepting, the payment; i.e.,
> ▪ It made full disclosure of all material facts; and
> ▪ On the basis of the information available to it, including, but not limited to, the Medicare instructions and regulations, it had a reasonable basis for assuming that the payment was correct, or if it had reason to question the payment[,] it promptly brought the question to the [Medicare Adminstrative Contractor's] attention.

Medicare Financial Management Manual ("MFMM"), Ch. 3, § 90.[14]  Plaintiff contends that it meets both requirements because it has always been "transparent" about its Lucentis practices and because, "given the state of Medicare guidance," a "provider in [its] position could not reasonably conclude . . . that it could not multi-dose" Lucentis.  Pl.'s Mem. 39, 40-41.  The record, however, demonstrates otherwise.

Under Medicare guidance, a provider is not without fault, and is therefore liable for an overpayment, if it "should have known" that the services were not covered.  MFMM, Ch. 3, § 90.1(H).  And by regulation, a provider is deemed to have constructive notice that a service is not covered based on either its "receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives" from Medicare contractors or its "knowledge of what are considered acceptable standards of practice by the local medical community."  42 C.F.R. § 411.406(e)(1), (3); see also MFMM, Ch. 3, § 90.1(H) ("In general, the provider should have known about a policy or rule if" a Medicare contractor "provided general notice to the medical community concerning the policy or rule.").

---

[14] Chapter 3 of the Medicare Financial Management Manual is available at http://www.cms.gov/ Regulations-and-Guidance/Guidance/Manuals/downloads/fin106c03.pdf.

Here, as explained above, the Council identified four pieces of evidence that support its conclusion that Plaintiff "knew" or "should have known" that its Lucentis practices would not be covered by Medicare: (1) the preparation and administration instructions on the FDA-approved package insert, see AR 26-27; (2) the Lucentis LCD, which reiterates key portions of the FDA-approved labeling, id. at 27; (3) the drug manufacturer's own statements, which confirm that "the product's labeling does not support the practice of administering the contents of one vial of Lucentis to more than one eye or to more than one patient," id. at 27 (internal quotation marks omitted); and (4) the CDC's guidelines for injection safety, id. at 27-28. Because this evidence provided a sufficient basis for the Council to find that Plaintiff should have known that its administration of Lucentis would be excluded from coverage, Plaintiff is not entitled to a waiver of its repayment obligation. See 42 C.F.R. § 411.406(e)(1), (3); MPMM, Ch. 3, § 90.1(H).

Moreover, Plaintiff's claim of "transparency" rings hollow. The Lucentis package insert has been clear since 2006; the CDC guidelines have been clear since at least 2007; and the Lucentis LCD has been clear since January 2008. Yet Plaintiff did nothing to disclose its Lucentis practices until July 2008 — and even then, only after it realized it was under investigation by a Medicare contractor. There is nothing "transparent" about confessing conduct that has already been discovered.

One final point bears mentioning: Plaintiff repeatedly notes that, if it had administered Lucentis as directed, "it would have been entitled to the exact same payment" from Medicare. Pl.'s Mem. 7, 40 (emphasis deleted). Maybe so. But it would not have collected a $9 million windfall — at taxpayer expense — by seeking "reimbursement" for 3 to 4 times its actual cost for the drug. And it would not have subjected its own patients to an increased risk of infection solely for the sake of profit.

**CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment to Defendant and deny it to Plaintiff.

Dated:  February 13, 2014      Respectfully submitted,

               STUART F. DELERY
               Assistant Attorney General

               SHEILA M. LIEBER
               Deputy Branch Director

               */s/ Eric Beckenhauer*
               ERIC B. BECKENHAUER
               TAMRA T. MOORE
               Trial Attorneys
               U.S. Department of Justice
               Civil Division, Federal Programs Branch
               20 Massachusetts Ave. NW
               Washington, DC 20530
               Tel: (202) 514-3338
               Fax: (202) 616-8470
               E-mail: eric.beckenhauer@usdoj.gov

               *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 13, 2014, I filed the foregoing document with the Clerk of Court via the CM/ECF system, causing it to be served on Plaintiff's counsel of record.

*/s/ Eric Beckenhauer* _____
ERIC B. BECKENHAUER